590 F.2d 1156
 192 U.S.App.D.C. 40
 AMERICAN MARITIME ASSOCIATION, Appellant,
Shipbuilders Council of America, Seafarers International
Union of North America, AFL-CIO
v.
W. Michael BLUMENTHAL, Secretary of the Treasury, et al.
(three cases).
 Nos. 77-1934, 77-1962 and 77-1970.
 United States Court of Appeals,
District of Columbia Circuit.
 
 Argued 16 Oct. 1978.
Decided 20 Nov. 1978.
As Amended 24 Jan. 1979.
C.A.D.C., 1978.
 Joseph A. Klausner, Washington, D. C., with whom Thomas H. Boggs, Allan Abbot Tuttle, and John L. Oberdorfer, Washington, D. C., were on the brief, for appellant in No. 77-1934.
 J. Stephen Street, Washington, D. C., with whom William W. Scott and Richard E. Schwartz, Washington, D. C., were on the brief, for appellant in No. 77-1970.
 Howard Schulman, New York City, with whom David Jaffe, New York City, was on the brief, for appellant in No. 77-1962.
 William J. Cassidy, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Dennis A. Dutterer and Regina A. McGranery, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee, W. Michael Blumenthal in Nos. 77-1934, 77-1962 and 77-1970.
 Mark P. Schlefer, Washington, D. C., with whom Michael Joseph and Thomas L. Mills, Washington, D. C., were on the brief, for appellee, Amerada Hess Corporation in Nos. 77-1934, 77-1962 and 77-1970.
 Before BAZELON, McGOWAN and WILKEY, Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILKEY.
 WILKEY, Circuit Judge:
 
 
 1
 This case involves the applicability of a section of the Merchant Marine Act of 1920[1] known as the "Jones Act"[2] to the transportation of crude oil by foreign-flag tanker from Valdez, Alaska, to the U.S. Virgin Islands, and the subsequent transport of products refined from that oil from the Virgin Islands to the continental United States. In the District Court plaintiffs American Maritime Association (U.S. steamship companies), Shipbuilders Council of America (domestic shipbuilders), and Seafarers International Union (maritime labor union) sought a declaratory judgment against the defendant Secretary of the Treasury and intervening defendant Amerada Hess Corporation (owner of the crude oil cargo) providing that the transport of the oil violated the Jones Act and an injunction to compel the U.S. Customs Service (Treasury Department) not to issue permits and clearances needed for its transport.[3] District Judge Oliver Gasch ruled against the plaintiffs and dismissed the action.[4] Finding the action of the trial court and the Customs Service preceding it to be based on sound statutory interpretation, judicial and administrative precedent, we affirm.
 
 I. BACKGROUND
 
 2
 Among the many diversified petroleum interests of Hess is the ownership and operation of an oil refinery in St. Croix, Virgin Islands. Constructed in 1966, this refinery is the principal manufacturing facility of Hess and, apart from port and other facilities at St. Croix owned by Hess, represents an investment of some $650 million.[5] In a representative period, 83% Of the products produced at the Virgin Islands refinery are shipped by Hess to the continental United States, and the remainder marketed for use in the Virgin Islands or sold to the United States Government.[6] In 1969 Hess acquired an interest in Alaska's North Slope oil, which, from the southern terminus of the Alaska pipeline at Valdez, must be transported by tanker to a refinery for processing.
 
 
 3
 Planners of the Alaska pipeline system initially contemplated that the sea leg from Valdez would be relatively short, as the crude oil would be transported only to the U.S. West Coast.[7] The current glut of oil in the Western United States, however, has made it necessary to transport and refine Alaskan crude oil elsewhere. In 1969 Hess announced its plans to transport its share of the Prudhoe Bay crude from Valdez around Cape Horn to its St. Croix refinery in foreign-flag tankers.[8] At St. Croix the crude would be refined into some eleven separate products which, with the exception of a small portion consumed in the Virgin Islands, would be exported to the United States.[9] In furtherance of Hess' petroleum enterprise, the Hercules, a foreign-flag tanker, began its voyage from Valdez to St. Croix on 3 September 1977.[10]
 
 
 4
 We now turn to the maritime laws of the United States and the Government enforcement agency involved here. From our First Congress in 1789, American shipping in the United States coastwise maritime trade has been protected from foreign competition.[11] Traditionally, in order to encourage the development of an American merchant marine, for both national defense and commercial purposes, all vessels engaged in the coastwise or other domestic trade have been required to be American-built and American-owned.[12]
 
 
 5
 The foreign maritime trade of the United States has always and necessarily been different. As a practical commercial matter it would be impossible to prohibit foreign-flag vessels from carrying goods to and from the United States and another country. The purchaser or supplier of goods to or from the United States would have equal right, and the commercial and political leverage to enforce such right, to have the goods transported in vessels of its choice. Hence, the United States effort to maintain an adequate merchant marine in foreign commerce has, at least in the twentieth century, gone the route of subsidizing the construction of vessels in American shipyards and subsidizing the additional operational costs of an American crew manning the ship by American safety standards.[13]
 
 
 6
 While most of the Congressional discussions in regard to tanker shipments from Valdez assumed carriage in American-flag vessels, it is clear that this assumption was based on the original belief that Alaskan crude would be transported to and refined in West Coast ports.[14] The coastwise laws of the United States would then have unquestionably required the transport to be in American bottoms,[15] and this would also be true if the transport of Alaskan crude were from Valdez to, say, Delaware. It was the introduction of the St. Croix refinery in the Virgin Islands into the processing of Alaskan crude which first arguably made possible the use of foreign-flag vessels to carry the cargo.[16]
 
 
 7
 On 3 October 1969 plaintiff Shipbuilders Council inquired of the Commissioner of Customs as to whether Alaskan crude could, under the coastwise laws, be transported to the Virgin Islands, refined there, and then the products shipped to the United States in tankers not entitled to engage in the coastwise trade; in other words, whether the use of a foreign-flag tanker such as the Hercu les would violate the Jones Act.[17] In reply the Commissioner referred to "a number of cases involving the transportation of merchandise between coastwise points by way of an intermediate foreign port at which the merchandise underwent some form of processing," and stated that "if the main purpose of the exportation was to have the merchandise thus processed and if the processing was not merely incidental to an intended transportation between American ports," then the prohibition of the Jones Act did not apply and the transportation could be by a foreign vessel.[18] The Commission pointed out that the Bureau of Customs ordinarily considered processing to be "substantial," and thus likely to be the "main purpose" of the exportation, if it "changed the merchandise physically, improved its condition, and advanced it in value, so that after processing it was a new and different product. . . ."[19] No formal ruling from the Customs Service was then forthcoming, but plaintiffs renewed their effort to obtain such ruling at the time of the voyage of the Hercules in 1977. The Service responded by issuing formal notice of a proposed amendment to the Customs Regulations, which would provide:
 
 
 8
 A coastwise transportation of merchandise takes place, within the meaning of the coastwise laws, when merchandise laden at a point embraced within the coastwise laws ("coastwise point") is unladen at another coastwise point, regardless of the origin or ultimate destination of the merchandise. However, merchandise is not transported coastwise if at an intermediate port or place other than a coastwise point (that is, at a foreign port or place, or at a port or place in a territory or possession of the United States not subject to the coastwise laws), it is manufactured or processed into a new and different product, and the new and different product thereafter is transported to a coastwise point.[20]
 
 
 9
 The Service further explained that where such manufacturing or processing of a product takes place at a non-coastwise point, "either segment (or both segments) of the overall transportation (to and from the non-coastwise point) may be accomplished by vessels not qualified to engage in the coastwise trade" because "the continuity of the transportation is broken at the intermediate port or place and . . . the new and different product resulting from the manufacturing or processing is not the same as that laden at the initial coastwise point."[21]
 
 
 10
 On 2 September 1977, the day before the Hercules was to commence its voyage, plaintiff American Maritime Association sought a temporary restraining order to enjoin the Secretary of the Treasury from permitting the Hercules, or any other foreign-flag vessel, from departing Valdez, Alaska, laden with Alaskan crude for the Virgin Islands.[22] The TRO was denied that same day, but because of the imminent voyage, the hearing on motions for preliminary and final injunction was consolidated and tried on 3-4 October. On 13 October 1977 District Judge Gasch ruled that carriage by a foreign-flag vessel of Alaskan oil to the Hess refinery in the Virgin Islands, where the oil would be refined and the products thereafter shipped to the continental United States, was not a violation of the Jones Act.[23]
 
 II. THE STATUTES AND ISSUES
 
 11
 The Merchant Marine Act of 1920, § 27 (the Jones Act) provides:
 
 
 12
 . . . No merchandise shall be transported by water, or by land and water, on penalty of Forfeiture thereof, between points in the United States, including Districts, Territories, and Possessions thereof embraced within the coastwise laws, either directly or via a foreign port, or for any part of the transportation, in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States . . . .[24]
 
 
 13
 With regard to the Virgin Islands, however, the above language is qualified by § 21:
 
 
 14
 . . . (T)he coastwise laws of the United States shall not extend to the Virgin Islands of the United States until the President of the United States shall, by proclamation, declare that such coastwise laws shall extend to the Virgin Islands and fix a date for the going into effect of same.[25] (No party contends such proclamation has ever issued.)
 
 
 15
 While the parties have argued extensively on the overall purpose of the Merchant Marine Act of 1920, the numerous decisions dealing with the continuity of flow in foreign and interstate commerce[26], and the impact of the Magnuson Amendment to the Ports and Waterways Safety Act of 1972,[27] we view the problem as one of straightforward statutory construction.
 
 
 16
 On the facts of this case, the key words of the Jones Act are its flat prohibition: "No merchandise shall be transported . . . Between points in the United States . . . (in foreign vessels) . . ." The central issue, therefore, is whether the "merchandise" (crude oil) transported from Valdez to St. Croix by Hess is so similar to the "merchandise" (refined oil products) subsequently shipped from St. Croix to the continental United States that the processing at St. Croix fails to interrupt an essentially single voyage of the oil from Valdez, Alaska, to the East Coast. If the oil and its by-products are deemed to constitute a single element of "merchandise," then the same "merchandise" travels between Valdez and an East Coast port I. e., between two "points in the United States" and is subject throughout that voyage to the prohibitions of the Jones Act. If, on the other hand, the processing at St. Croix effects such a substantial metamorphosis of the oil that an essentially different "merchandise" is transported on the second leg of the trip than on the first, the "single" voyage from Valdez to the East Coast is severed at St. Croix. Because the Virgin Islands are expressly excluded from U.S. coastwise laws,[28] neither of these two sub-voyages would be between two "points in the United States, including . . . possessions thereof embraced within the coastwise laws,"[29] and no vessel carrying merchandise on the two voyages would fall within the proscriptions of the Jones Act.
 
 
 17
 Further, we must consider the argument of appellant Seafarers Union that the Trans-Alaska Pipeline Authorization (TAPS) Act[30] and the Magnuson Amendment[31] bar the transportation of Alaskan oil in foreign vessels.
 
 
 18
 We turn first to the issues related to the identity of "merchandise" argument under §§ 21 and 27 of the Merchant Marine Act of 1920, and then consider separately the impact of the TAPS Act.
 
 
 19
 III. APPLICABILITY OF THE MERCHANT MARINE ACT OF 1920
 
 A. "Merchandise" Section 27 (Jones Act)
 
 20
 Section 27 speaks of "merchandise" being transported.[32] The inquiry thus becomes what merchandise is transported from Valdez to St. Croix and what merchandise is transported from St. Croix to the continental United States? It is clear that the merchandise on the first leg is Alaskan crude oil. If the facts of this case ended with the arrival of the Alaskan crude at the Hess refinery in St. Croix, Virgin Islands, the case would be very simple, because § 21 plainly states, "(T)he coastwise laws of the United States shall not extend to the Virgin Islands";[33] hence § 27, perhaps the most important of the "coastwise" laws, would not restrict the transport to American vessels.
 
 
 21
 But the facts do not end at the Hess refinery, for it is there that the Alaskan crude is refined into eleven products, which are then largely transported to the continental United States.[34] Appellants contend that the two voyages must be considered as one and that the petroleum, whether in crude or refined form, must be thought of as one product, I. e., one type of "merchandise" within the statute. It is only on this theory that the Jones Act (§ 27) can apply to this case, I. e., if the "merchandise" transported from Valdez to St. Croix is the same "merchandise" subsequently transported to the continental United States, and if the two legs of the voyage thus must be treated as one.
 
 
 22
 We cannot agree with this concept, because crude oil is simply quite different from the ultimate products which come out of a refinery. Judge Gasch found that:
 
 
 23
 Alaskan oil that is refined at the Hess refinery will yield the following products in the following amounts:
 
 
 24
 Product % Volume
------- --------
benzene .47
toluene 2.23
xylene 0.27
paraxylene 1.08
regular gasoline 4.19
premium gasoline 4.19
unleaded gasoline 3.00
jet fuel 8.70
No. 2 Oil 14.50
No. 6 Oil 55.82
sulfer pellets 0.30
 --------
 94.75 total marketable
 product recovery
 5.25 fuel gas equivalent
 
 
 25
 Benzene, toluene, xylene and paraxylene are petrochemicals used in the manufacture of finished chemical products. Jet fuel is used as fuel for jet aircraft, and gasoline as fuel for motor vehicles. Sulphur is used in the manufacture of fertilizers and pharmaceuticals. No. 2 oil is used as home heating oil No. 6 oil is used as fuel by power plants. Each of these products is different in name, physical and chemical character, and use from each other and from crude oil. Moreover, crude oil cannot be used for any of these purposes.[35] (Emphasis added.)
 
 
 26
 We agree with the trial court's conclusion that "all the credible evidence of record conclusively demonstrates that the products of the Hess refinery are new and different merchandise from the Alaskan crude oil."[36] It thus seems clear that the "merchandise," the language of the statute, transported between Valdez and St. Croix is one thing, crude oil, while the "merchandise" transported from St. Croix to the continental United States is a collection of quite different other things, I. e., products which are physically, chemically, and usefully different from the original crude oil.[37] Assuming that the exception of § 21, "(t)he coastwise laws of the United States shall not extend to the Virgin Islands," applies in full vigor, then each voyage, carrying different merchandise, is between a point within the coastwise laws of the United States and a point outside the coastwise laws of the United States. We hold that the requirement of the Jones Act that the cargo be carried in American vessels does not apply to either voyage; each is outside the coastwise trade of the United States.[38]
 
 
 27
 Further, under the circumstances of this case, we hold that it is not the Intent of a shipper to send goods to a final destination that governs, but the degree to which the goods are altered In fact in the course of commercial dealings.[39] Thus we must reject appellants' contention that because Hess may have intended that most of the crude oil shipped from Valdez return in some form to the mainland United States in fact, that it was bound by law not to sell it abroad[40] the prohibitions of the Jones Act apply.[41] The enforcement provision cited by appellants which applies the penalty of forfeiture where there is "intent to evade" foreign vessel prohibitions[42] does not define under what circumstances evasion takes place. Such definition is provided in the substantive provisions of the Jones Act itself, which speaks not of Intent but of actual "transport" of "merchandise." Since appellants have not contended in this case that in the absence of an actual violation of the Jones Act the forfeiture provisions should apply, and since no evidence has been adduced of any intent by Hess to evade the Act absent such actual violation, the issue of intent does not govern this case.
 
 
 28
 B. "Via a Foreign Port" Section 27 (Jones Act)
 
 
 29
 Two other points should be noticed in regard to our interpretation of § 27. The words "either directly or via a foreign port"[43] were inserted in the original statute[44] by the Congress in 1893,[45] after the decision in United States v. 250 Kegs of Nails.[46] In that case the Government sought forfeiture of 250 kegs of nails which had been transported in a Belgian vessel from New York to Antwerp, there unloaded and reloaded upon a British vessel, which then transported the same nails (I. e., the same merchandise) to California. The statute then in effect did not contain the phrase "either directly or via a foreign port." Both the District Court and the Ninth Circuit found the statute inapplicable to the transportation of the nails, because "(i)n the plain and ordinary meaning of the words, 'to transport goods from one domestic port to another' means to carry goods In one continuous voyage . . . . It does not mean to carry them in two distinct and separate voyages, or in two distinct vessels. . . ."[47] Congress, seeing how easily the protection to American shipping would be vitiated by a simple transshipment of the same cargo, inserted the words "either directly or via a foreign port" to prohibit such simple transshipment.
 
 
 30
 The legislative history of the "via a foreign port" amendment shows the limited purpose of Congress, only to extend coverage to the type activity involved in 250 Kegs of Nails ; the debates did not even refer to merchandise that was to any degree processed in a foreign country.[48] No language in the statute indicates that the landing of the cargo in a foreign port for the legitimate purpose of manufacture or processing of the goods would not convert the goods to other merchandise or would not interrupt the continuity of the voyage.[49] The words "either directly or via a foreign port" have reference only to the Keg of Nails situation, I. e., the simple transshipment of the same goods in a foreign port, which under the amended statute does not break the continuity of the voyage. What we have here in the operations of the St. Croix refinery is a far different undertaking from simple transshipment of the same "merchandise."
 
 C. "Forfeiture" Section 27 (Jones Act)
 
 31
 The last point to be made in regard to § 27 is the implication derived from the penalty of Forfeiture for a violation of carrying cargo by non-U.S. vessels in the coastwise trade. It is well understood that statutes imposing a forfeiture, particularly the horrendous penalty of forfeiture of an entire cargo worth millions of dollars, are to be construed strictly.[50] The rationale for such strict construction that persons should receive clear and unequivocal warning before facing exposure to harsh penalties[51] is especially applicable here, where the penalty for noncompliance is enormous.[52] The application of this principle is not undercut by the argument, strenuously urged by the appellants, as to the applicability of numerous judicial precedents involving the flow of interstate and foreign commerce. It is also well understood that such statutes of a regulatory nature are to be construed broadly, and appellants urge that this applies to the Jones Act in this case.[53]
 
 
 32
 We do not agree; the Jones Act is an Act for a very specific purpose, with sharply defined contours, and the forfeiture provision is a strict penalty for a violation of such a limited and sharply defined statute. In its effect the Jones Act, though pertaining to commerce, thus bears a closer resemblance to other penal statutes than it does to statutes generally regulating commerce. Decisions construing regulatory statutes broadly, from their very nature and purpose, are of doubtful applicability.[54]
 
 
 33
 D. Policy Concerns Behind the Virgin Islands Exemption Section 21
 
 
 34
 There is another and stronger reason why the long line of unquestioned authority in regard to interstate and foreign commerce should not govern our interpretation of §§ 21 and 27 of the Merchant Marine Act of 1920. No one here contends that the flow of crude oil from Prudhoe Bay and then in the form of gasoline to the gas tank of the ultimate consumer anywhere in the continental United States is not domestic, interstate U.S. commerce. Such flow of commerce can be considered to take place through foreign ports, and through ports outside of the coastwise trade, even though the substances involved go through numerous transformations. This process is all in the flow of commerce, no one here contends otherwise, and Congress regulates this commerce in a myriad of ways.
 
 
 35
 But what we have here is a statute which regulates the coastwise trade, defines very strictly what is covered within the coastwise laws, and in so doing excludes the Virgin Islands from the coverage of the coastwise laws, all for the very specific purpose of insuring that American-flag shipping has a monopoly on the carriage of goods in the coastwise trade. However, for reasons clear to Congress at the time, and probably for additional and different reasons equally clear to Congress later, the Virgin Islands have been excluded from the application of the coastwise laws, and have continued to be so excluded for many years, for national policies quite separate from those justifying the Jones Act restriction of carriage in American-flag vessels.[55] If Congress wishes to bring the Virgin Islands into the ambit of the U.S. coastwise trade, it can do so, and in fact has already left the decision up to the President to do so if the President so desires.[56]
 
 
 36
 The plaintiff-appellants themselves have recognized the long-standing interpretation of the Customs Service of the statute placing the Virgin Islands outside the coastwise laws; I. e., goods processed there originate for the next leg of their seaborne transportation outside the restriction of the Jones Act. In 1971 the Executive Director of appellant American Maritime Association, in connection with this statutory exemption for the Virgin Islands, advised a colleague, "(T)he present situation permits foreign-flag tankers to carry crude oil from, say, Alaska, to be refined on the islands and then transshipped, again by foreign flags, to the East Coast."[57] As recently as February 1976, representatives of all three appellants here testified or submitted statements to Congress in support of a bill which would amend coastwise laws to extend them to the Virgin Islands with respect to the transportation of crude oil, residual crude oil, and refined petroleum products.[58] This was but one of at least ten unsuccessful attempts to have the exemption modified or repealed.[59]
 
 
 37
 It is quite apparent that there are strong policy arguments, economic and political, dictating that the Virgin Islands exemption from the coastwise laws remain. Two tankers the size of the Hercules, transporting almost 220,000 tons of crude each, operating in full service the year around from Valdez to St. Croix, would only bring to the Hess refinery 5% Of its annual output.[60] All the other crude comes from sources outside the United States, is transported in either foreign-flag or U.S.-subsidized vessels to St. Croix, and is then transported in either foreign-flag or U.S.-subsidized vessels from St. Croix to the continental United States. In addition to petroleum and its products, there are large cargoes of rum and sugar which flow from the Virgin Islands to the United States in foreign bottoms. If the economics and politics of the matter call for the inclusion of the Virgin Islands in the coastwise trade of the United States, then all of this would have to be carried in American-flag ships. Obviously, there are large and conflicting economic and political interests both opposing and supporting the continuation of the Virgin Islands exemption from the coastwise laws; it all adds up to a policy choice for Congress, not any court, where the language and intent of the statute are as clear as they are in this case.
 
 
 38
 We appreciate the fact that appellants here do not petition this court to lift, by fiat, the Virgin Islands exemption. Rather, appellants aim were narrowly to invoke the prohibitions of the Jones Act only against foreign vessels involved in the transport of crude oil from the mainland United States to the Virgin Islands, where petroleum products refined from that same oil are transported back to the mainland. Yet we believe that to grant appellants' petition, even on the narrow facts of the Alaskan crude oil trade, would inevitably jeopardize the export from the Virgin Islands to the United States not only of petroleum products refined from mainland oil, but of All products manufactured or processed in the Virgin Islands of constituent elements brought from the United States. For we are not convinced that the facts of the Alaska crude oil trade, or of the petroleum trade generally, are so particularized as to distinguish that trade from other forms of trade carried on between the Virgin Islands and the United States.[61]
 
 
 39
 Even more significantly, a holding favorable to appellants in this case would jeopardize innumerable foreign industries, in lands other than the Virgin Islands, that rely both on American sources of supply for raw materials and on the vast American market for re-export. For a holding in favor of appellants would seriously undermine the general proposition, on which significant sectors of world trade rely, that goods exported from the United States to undergo substantial processing or manufacture abroad before re-entering the American market are, upon their re-entry, new and different products not subject to the Jones Act prohibition.[62]
 
 
 40
 In a world of increasingly complex and interdependent patterns of commerce, no court should rush to erect new and formidable trade barriers without clearest guidance from other, accountable branches of Government. Though appellants here seek a limited decision, we believe that the decision they seek could not logically or practically be bound to its particular facts and that its effects could bring serious harm to the foreign commerce of the United States and to other foreign shores and markets. For compelling reasons of both law and policy, we decline to set in motion such an unwarranted and unwanted train of
 
 
 41
 events. IV. THE NON-APPLICABILITY TO THIS CASE OF THE
 
 MAGNUSON AMENDMENT TO THE PORTS AND WATERWAYS
 SAFETY ACT OF 1972
 
 42
 In addition to the argument advanced by appellants American Maritime Association and Shipbuilders Council, the Seafarers Union contends that "quite apart from the Jones Act, for environmental purposes, the carriage of TAPS[63] oil in the coastwise trade is confined to American vessels and . . . the carriage of that oil by foreign tankers in the coastwise trade is illegal."[64] Seafarers draws this argument from the Magnuson Amendment,[65] which was introduced to advance the date for environmental rules and regulations applicable under the Ports and Waterways Safety Act of 1972[66] to U.S.-flag vessels in the coastwise trade. This was accomplished by differentiating between foreign and U.S. vessels in the foreign trade on one hand, and U.S. vessels in the coastwise trade on the other, by inserting two clauses and adding a sentence to the existing law, thus (amendment italicized):
 
 
 43
 (C) Rules and regulations published pursuant to subsection (7)(A) shall be effective not earlier than January 1, 1974, With respect to foreign vessels and United States-flag vessels operating in the foreign trade, unless the Secretary shall earlier establish rules and regulations consonant with international treaty, convention, or agreement, which generally address the regulation of similar topics for the protection of the marine environment. In absence of the promulgation of such rules and regulations consonant with international treaty, convention, or agreement, the Secretary shall establish an effective date not later than January 1, 1976, With respect to foreign vessels and United States-flag vessels operating in the foreign trade, for rules and regulations previously published pursuant to this subsection (7) which he then deems appropriate. Rules and regulations published pursuant to subsection (7)(A) shall be effective not later than June 30, 1974, with respect to United States-flag vessels engaged in the coastwise trade.[67]
 
 
 44
 From this Seafarers Union argues that there are only three types of vessels covered: foreign vessels in the U.S. foreign trade, U.S. vessels in the same trade, and U.S. vessels in the coastwise trade I. e., that there is a singular omission of U.S. vessels in the continental United States-Virgin Islands trade, which, by § 21 of the Merchant Marine Act of 1920, is Not within the coastwise trade.
 
 
 45
 From this the Seafarers Union further argues that "the TAPS act and particularly its Magnuson Amendment, was an environmental law, not a coastwise law, and that since the Virgin Islands exemption from the Jones Act applied only to the coastwise, cabotage, laws, there was no Virgin Islands exemption in the clear Congressional mandate in the TAPS Act that, for environmental reasons, only American vessels could carry TAPS oil in the coastwise trade."[68] We agree with the Seafarers Union that the Magnuson Amendment dealt with an environmental law, not a coastwise law, but we cannot find the rationale for the rest of its argument.
 
 
 46
 First, it is clear, as Seafarers Union itself points out, that the environmental provisions of 46 U.S.C. § 391a apply to all vessels entering the navigable waters of the United States which have on board a cargo of oil. This includes, of course, the Virgin Islands.[69] In other words, the ship Hercules, of foreign registry, is completely subject to U.S. environmental laws while in U.S. navigable waters near Valdez, the Virgin Islands, or the continental United States. The Ports and Waterways Safety Act of 1972, as amended by the Magnuson Amendment, applies broadly and clearly to "(a)ll vessels . . . which are documented under the laws of the United States Or enter the navigable waters of the United States . . . ."[70] The Hercules is such a vessel, and thus is covered by the amendment and by its environmental provisions.[71]
 
 
 47
 Second, and fundamentally, the purpose of the Magnuson Amendment had nothing whatsoever to do with restricting foreign vessels in American maritime commerce. True, there is much dialogue on the Congressional floor in regard to the carriage of the Alaskan crude by American vessels in the "maritime leg" of the oil transport, but in every instance brought to our attention, the maritime leg in the contemplation of the speaker was from Valdez to a West Coast continental United States port, where the Jones Act clearly would have required an American-flag vessel to be used.[72] The purpose of the Magnuson Amendment was simply to advance the effective date for rules and regulations in regard to the coastwise trade, pursuant to 46 U.S.C. § 391a(7)(A), to be effective not later than 30 June 1974. Actually, since there was a delay in the flow of Alaskan oil through the pipeline, both this advanced date and the effective date for the environmental rules and regulations pertaining to the foreign trade vessels, both U.S. and foreign, arrived before there was any oil to be carried anyway. The Magnuson Amendment thus had no practical effect.
 
 
 48
 Third, no negative inference can be drawn from the arguable omission of the Hercules and like vessels from the reach of the amendments. In light of the Virgin Islands exemption from United States coastwise laws,[73] a vessel transporting goods from the mainland United States to the Virgin Islands arguably is engaged in an anomalous species of "foreign trade,"[74] and thus falls within the class of "foreign vessels . . . operating in the foreign trade" to which the Magnuson Amendment specifically applies.[75]
 
 
 49
 Finally, fundamentally, and devastatingly, there is not one word in the Magnuson Amendment or any part of the whole TAPS Act which explicitly commands that only U.S.-flag vessels be used in the transport of Alaskan crude. The Virgin Islands exception to the Jones Act is not cited and is certainly not repealed by these environmental amendments. The most that can be said, and really this is all Seafarers' brief says, is that various Congressmen Assumed that, because of the requirements of the Jones Act and because they were thinking in terms of West Coast U.S. ports, only American vessels would be involved in the transport of Alaskan crude to the United States. But this assumption was never written into law, and it is highly doubtful, given the obvious powerful economic and political forces lined up on either side of the Virgin Islands exemption from the coastwise laws question, whether it could have been. Certainly all efforts to repeal the Jones Act Virgin Islands exemption have failed, as discussed above.[76]
 
 
 50
 In summary, if the TAPS Act and the Magnuson Amendment particularly are considered as separate statutes with a separate environmental purpose, as appellant urges and with which we agree, then there is not one word in that statute which restricts the carriage of Alaskan crude oil to American-flag vessels. To find such a restriction in the United States Code, one must resort to the Merchant Marine Act of 1920, and there one simultaneously finds the exemption of the Virgin Islands from the coastwise trade, without which the coastwise trade restriction would otherwise govern the carriage of Alaskan crude from Valdez to any U.S. territory port. The Magnuson Amendment simply has no application to this case.
 
 
 51
 For the reasons set forth above, the case is
 
 
 52
 Affirmed.
 
 
 
 [1]
 Pub.L.No.66-261, 41 Stat. 988, ch. 250 (5 June 1920), as amended, 46 U.S.C. §§ 861-89 (1970 & Supp. V 1975)
 
 
 [2]
 Merchant Marine Act of 1920, § 27, 41 Stat. 999, as amended, 46 U.S.C. § 883 (Supp. V 1975). The term "Jones Act" is perhaps most commonly used to refer to section 33 of the Merchant Marine Act of 1920. See 41 Stat. 1007, 46 U.S.C. § 688 (1970). This section provides for recovery for injury to, or death of a seaman. See id. In this opinion, however, we will use the term "Jones Act" to refer only to section 27 of the Merchant Marine Act of 1920
 
 
 [3]
 The initial complaint was filed by Appellant American Maritime Association on 2 September 1977. See Jt.App. at 35-48
 
 
 [4]
 American Maritime Association, et al. v. Blumenthal, et al., No. 77-1508, 458 F.Supp. 849 (14 Oct. 1977) (Gasch, J.)
 
 
 [5]
 See Brief for Appellee Hess Corp. at 4-5
 
 
 [6]
 Id. at 9
 
 
 [7]
 See note 72 Infra (review of legislative history indicating assumption of Congressmen that all Alaska oil would be shipped to U.S. West Coast)
 
 
 [8]
 See Brief of Appellee Hess Corp. at 6
 
 
 [9]
 Under present law Alaskan crude oil and its by-products cannot be sold abroad, although the oil may be exchanged for oil procured elsewhere in equivalent amounts. See Export Administration Amendments of 1977, Pub.L.No.95-52, § 110, 91 Stat. 235 (22 June 1977) (prohibiting export of Alaskan crude oil unless the President makes certain determinations)
 
 
 [10]
 The Hercules was a Liberian-flag crude oil tanker with a cargo capacity of 216,641 tons deadweight. The ship was chartered by Amerada Hess Corporation, and set sail from Valdez for St. Croix with a cargo of 1,466,000 barrels of crude oil worth approximately $20 million. See Brief for Appellee Blumenthal at 10-11. All of the crude oil carried by the Hercules was destined for manufacture into petroleum products at the St. Croix refinery. See Jt.App. at 609
 
 
 [11]
 See Act of 4 July 1789, ch. 2, § 5, 1 Stat. 24, 27 (discount on duties for goods imported in vessels owned by U.S. citizens); Act of 20 July 1789, ch. III, 1 Stat. 27 (tax on foreign vessels transporting U.S. products "coastwise" within the United States); Act of 1 March 1817, ch. 31, 3 Stat. 351 (direct prohibition of use of foreign vessels in domestic trade). These statutes are codified in their present form at 46 U.S.C. § 883 (Supp. V 1975)
 
 
 [12]
 For example, the Jones Act, which is the statutory centerpiece of the protective framework, was enacted "to protect the American shipping industry already engaged in the coastwise trade, to provide work for American shipyards, and to improve and enhance the American Merchant Marine." Marine Carriers Corp. v. Fowler, 429 F.2d 702, 708 (2d Cir. 1970), Cert. denied, 400 U.S. 1020, 91 S.Ct. 581, 27 L.Ed.2d 631 (1971). See also Central Vermont Transportation Co. v. Durning, 294 U.S. 33, 38-39, 55 S.Ct. 306, 79 L.Ed. 741 (1935); Pennsylvania Ry. Co. v. Dillon, 118 U.S.App.D.C. 257, 260 n.5, 335 F.2d 292, 295 n.5 (1964), Cert. denied, 379 U.S. 945, 85 S.Ct. 437, 13 L.Ed.2d 543 (1964). Cf. Merchant Marine Act of 1920, § 1, 46 U.S.C. § 861 (preamble) (purpose and policy of the United States to "have a merchant marine of . . . vessels sufficient to carry the greater portion of its commerce and serve as a naval or military auxiliary . . ."). Protection from foreign shipping competition has been deemed necessary to achieve these goals because of the vastly higher construction and operating costs involved in use of American-flag compared with foreign-flag vessels. A typical charter rate, for example, for an American-flag vessel capable of carrying 35,000 to 45,000 tons of cargo between St. Croix and New York would be $6.16 per long ton, compared with $3.69 per long ton for a foreign-flag vessel. Charter rates for a larger crude carrier capable of carrying 200,000 to 300,000 tons of cargo on a voyage from Valdez to St. Croix Via Cape Horn would be $24.90 per ton for an American-flag vessel compared with $5.85 per ton for a foreign-flag vessel. See Jt.App. at 107-09
 
 
 [13]
 No question concerning subsidies of American-flag ships involved in foreign commerce, however, is raised by this case. The Hercules is a foreign-flag vessel, Valdez is an American port, and this case concerns the legality of deployment of foreign-flag vessels to carry oil between American ports and the U.S. Virgin Islands
 
 
 [14]
 See page --- of 192 U.S.App.D.C., page 1170 of 590 F.2d & note 72 Infra
 
 
 [15]
 See page --- of 192 U.S.App.D.C., page 1160 of 590 F.2d & note 24 Infra (Jones Act proscription)
 
 
 [16]
 The Hess Corporation's so-called "Alaskan crude oil refining unit" at St. Croix on the Virgin Islands became operational in 1971 and represented an investment of approximately $80 million. See Brief for Appellee Blumenthal at 4. This refining unit was similar to other units already in operation at the Corporation's St. Croix refinery, however, and was adaptable to process crude oil imported from other parts of the world. Id
 
 
 [17]
 See Brief for Appellant Shipbuilders Council app. at 19a
 
 
 [18]
 Id
 
 
 [19]
 Id. at 19a-20a
 
 
 [20]
 42 Fed.Reg. 46068 (1977)
 
 
 [21]
 See id. (supplemental information as background to proposed rule)
 
 
 [22]
 See Jt.App. at 35-48
 
 
 [23]
 See American Maritime Association et al. v. Blumenthal et al., supra, at 863
 
 
 [24]
 46 U.S.C. § 883 (emphasis added)
 
 
 [25]
 Merchant Marine Act of 1920, § 21, 41 Stat. 997, as amended by Act of 16 April 1936, Pub.L.No.74-520, 49 Stat. 1207, ch. 228, 46 U.S.C. § 877 (1970) (emphasis added)
 
 
 [26]
 See note 54 Infra
 
 
 [27]
 The "Magnuson Amendment" was passed as § 401 of Pub.L.No.93-153, Title IV, 87 Stat. 589 (16 Nov. 1973). The Act is codified in scattered sections of the U.S.C. and the Magnuson Amendment altered various provisions of 46 U.S.C. § 391a(7)(C), earlier enacted as part of the Ports and Waterways Safety Act of 1972, Pub.L.No.92-340, 86 Stat. 424 (10 July 1972), 33 U.S.C. §§ 1221-27; 46 U.S.C. § 391a (Supp. V 1975). See Pages --- - --- of 192 U.S.App.D.C., pages 1169-1171 of 590 F.2d & notes 63-76 Infra (appellant Seafarers Union environmental law argument)
 
 
 [28]
 See 46 U.S.C. § 877
 
 
 [29]
 See 46 U.S.C. § 883
 
 
 [30]
 "TAPS" Act is a term invented by appellant Seafarers Union to describe Title II of P.L. 93-153. See Brief for Appellant Seafarers Union at 5
 
 
 [31]
 See note 27 Supra
 
 
 [32]
 46 U.S.C. § 883
 
 
 [33]
 46 U.S.C. § 877
 
 
 [34]
 There is no evidence in the record indicating specifically how oil imported from Alaska for refining at the Virgin Islands is marketed. But the record does indicate how oil with which the Alaskan oil is commingled at the Hess refinery has been marketed in a representative period. See page --- of 192 U.S.App.D.C., page 1158 of 590 F.2d & note 6 Supra
 
 
 [35]
 American Maritime Assoc. et al. v. Blumenthal et al., supra, at 862 (footnotes omitted)
 
 
 [36]
 Id. at 862
 
 
 [37]
 Id. at 862. See also Brief of Appellee Hess Corp. at 5 (listing various products distilled and processed from crude oil at St. Croix refinery). Cf. Shell Oil Co. of Canada, Ltd. v. United States, 27 C.C.P.A. 94, 100 (1939) (separation of constituent materials of crude petroleum is a process of manufacture that creates new product subject to import tax)
 It is conceded, as alleged by one appellant, that this "same" or "different" test involves semantic concerns. See (Reply) Brief for Appellant Shipbuilders Council at 4. But the task of construing words of a statute and applying those words to an actual commercial situation, in light also of policy concerns and the reasonableness of a statute's particular application, is precisely what we are called upon to do in this case. The task is a recurrent one for lawyers, and though the relevant considerations may be "abstract," See id., they are decidedly not "irrelevant."
 Appellant argues, for example, that the process of refining oil is insignificant because it merely "separates . . . molecules according to their boiling points" and leaves the fundamental physical "matter" of the oil the same. See id. at 3. The issue, it is contended, is reducible merely to "whether one regards the whole (crude oil) as being more or less than the sum of its parts (the products)." Id. at 3-4. We would state the question differently. The issue is not whether the whole of a particular substance is More or less than its parts, but whether after a refining or manufacturing process which, for example, breaks the substance down into constituent elements or combines it with other elements to create new substances, the product remains largely the Same in such respects as form, composition, value or function.
 In a complex physical world in which matter is constantly being transformed into other forms, appellants' simplistic argument concerning the identity of physical "matter" after a refining process would prove too much. It would compel the conclusion that because of the innumerable forms which matter may take, no degree of transformation of one good into another changes the essential nature of that good and its by-products. For practical and commercial purposes, however, this is not correct. In commercial usage, for example, sea water is not the same as the hydrogen, oxygen, and various chemicals and minerals into which it can be broken down, and a soft drink bottled for sale is not the "same" as the water, sweeteners, and other substances from which it is made. Of course the opposite argument can also be taken too far: that even the slightest alteration of a substance (for example, perhaps, the mere bottling of spring water) effects a "new and different product."
 Thus the precise point at which a substance subjected to an altering process becomes "different" eludes simple definition; attempts at a universal description would lead into metaphysical realms which a court should fear to enter. But we submit that along a spectrum of possible change for any particular item, there exists a point determinable perhaps only through experience and subject to change through time and circumstance at which that item, when altered in some substantial respect, becomes new and different. The fact, for example, that the oil in the present case may increase little in market value after processing, See Brief for Appellant American Maritime Association at 5, is not dispositive, because value is only one of the considerations that a court must make in determining if a product has changed through processing. Common sense and experience the best guides to courts will aid the determination of the point at which substantial change has occurred in particular cases.
 
 
 [38]
 This holding should come as no surprise to appellants, since it coincides with their own, earlier interpretation of the implications of the Merchant Marine Act for the Virgin Islands oil trade. See page --- of 192 U.S.App.D.C., page 1167 of 590 F.2d & note 57 Infra (statement of Executive Director of appellant American Maritime Association)
 This holding also is consistent with "letter rulings" of the Customs Service in the past on transshipment issues under the Jones Act. These rulings, though addressed to individuals and not developed through adversarial or any form of rulemaking proceedings, are binding on the agency, See 19 C.F.R. § 177.9, and merit some deference by a reviewing court, See Gulf Oil Corp. v. Hickel, 140 U.S.App.D.C. 368, 372, 435 F.2d 440, 444 (1970). See generally Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) (statutory interpretation by an agency responsible for the administration of that statute is entitled to great weight). In these rulings the degree to which a product has been altered by processing at the point of transshipment has generally been dispositive of whether the continuity of its transportation has been broken at that point and of whether the product, for purposes of the Jones Act, is the same or different "merchandise" upon re-entry to the United States. See rulings of 17 Oct. 1938; 15 Jan. 1963; 6 July 1964; 9 Sept. 1964; 22 Nov. 1968; 18 March 1969; 7 July 1969; 6 Oct. 1971; 12 Feb. 1975; rulings Reprinted in Brief for Appellant Shipbuilders Council app. at 3a-30a. Cf. Schedule 8, Part 1, of the Tariff Schedules of the United States, 19 U.S.C. § 1202 ("Any product of the United States which is returned after having been advanced in value or improved in condition abroad by any process of manufacture or other means, or any imported article which has been assembled abroad in whole or in part of products of the United States, shall be treated for the purposes of this Act as a foreign article . . . .").
 
 
 [39]
 Similarly, in construing the predecessor statute to the present Jones Act, the Ninth Circuit stated in United States v. 250 Kegs of Nails, 61 F. 410, 412 (9th Cir. 1894) (emphasis added):
 . . . The purpose the parties had in view can make no difference with the interpretation of the statute. They practiced no concealment or fraud upon the government. Their acts were done openly. They had the statute before them for their guidance. . . . The statute left them free to ship goods . . . in any manner they saw fit, save and except the manner therein prohibited.
 
 
 [40]
 See note 9 Supra
 
 
 [41]
 See, e. g., Brief for Appellant Shipbuilders Council at 4-5
 
 
 [42]
 See Act of 17 June 1930, ch. 497, title IV, § 588, 46 Stat. 749, 19 U.S.C. § 1588 (1976)
 
 
 [43]
 See 46 U.S.C. § 883. Because of the explicit exemption of the Virgin Islands from the coastwise laws, the Virgin Islands are, For the limited purposes of the Jones Act, analogous to a "foreign port." See id. This point is conceded by one of the appellants, See Brief for Appellant Shipbuilders Council at 3, but disputed by another, See Reply Brief for Appellant American Maritime Association at 23. Disagreement concerning the precise term of identification to be applied to the Virgin Islands in this context is merely academic, however, for the words of the statute suffice to resolve the issue at hand. Merchant Marine Act of 1920 § 21 excludes the Virgin Islands from the "coastwise laws of the United States," See 46 U.S.C. § 877, and thus withdraws the Islands from the prohibitions of the Jones Act, which by its own terms applies only to transportation of merchandise to points "within the coastwise laws" of the United States, See 46 U.S.C. § 883
 
 
 [44]
 See Act of 1 March 1873, 17 Stat. 483, § 4347 Revised Statutes, as amended 3 March 1883, 22 Stat. 641
 
 
 [45]
 Act of 15 February 1893, ch. 117, 27 Stat. 455
 
 
 [46]
 61 F. 410, Supra, aff'g, 52 F. 231 (S.D.Cal.1892)
 
 
 [47]
 United States v. 250 Kegs of Nails, supra, 61 F. at 411 (emphasis added)
 
 
 [48]
 Legislative debate focused only on the issue of transshipment without reprocessing, where a vessel "without breaking bulk or . . . cargo" could merely "call at" a foreign port and then return to the United States. See 39 Cong.Rec. 1416, 1488 (1893)
 
 
 [49]
 As the Ninth Circuit stated in United States v. 250 Kegs of Nails, supra, 61 F. at 412: "(The shippers of the goods) had the right to assume that the whole intention of congress had been expressed in the words of the statute."
 
 
 [50]
 See id. at 413 (in construing an ambiguous statute, doubt must be resolved against forfeiture). See also United States v. One 1936 Model Ford Coach, 307 U.S. 219, 226, 59 S.Ct. 861, 83 L.Ed. 1249 (1939); Howard v. Federal Crop Ins. Corp., 540 F.2d 695, 697 (4th Cir. 1976); The Snapper King, 127 F.2d 490, 491 (5th Cir. 1942); United States v. Worthington, 117 F.2d 936, 937 (9th Cir. 1941); Kane v. McDaniel, 407 F.Supp. 1239, 1242 (W.D.Ky.1975); United States v. One 1947 Oldsmobile Sedan, 104 F.Supp. 159, 161 (D.N.J.1952); Warner v. United States, 301 F.2d 327, 157 Ct.Cl. 1 (1962); C. Sands, Statutes and Statutory Construction §§ 58-60 (1974), and cases cited therein
 
 
 [51]
 See, e. g., United States v. Standard Oil Co., 384 U.S. 224, 230, 234-37, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966) (Harlan, J., dissenting)
 
 
 [52]
 See Brief of Appellee Hess Corp. at 4 (Hercules cargo worth $20 million)
 
 
 [53]
 See, e. g., Reply Brief for Appellant American Maritime Association at 6-9
 
 
 [54]
 The court also must reject appellants' argument, urged at length, that the present case is governed by domestic commerce clause cases. See, e. g., Brief for Appellant American Maritime Association at 25-32; Brief for Appellant Shipbuilders Council at 32-33. To support the contention that the refining of oil at St. Croix fails to interrupt the flow of that oil between points in the United States for purposes of the Jones Act, appellants cite the venerable line of early twentieth century cases which sustained congressional power to regulate allegedly intra-state economic activity because of the flow of subject goods in inter-state commerce. See, e. g., Bd. of Trade of the City of Chicago v. Olsen, 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839 (1922) (federal regulation of grain traders upheld despite interruption of transit of grain within state for storing and processing); Stafford v. Wallace, 258 U.S. 495, 42 S.Ct. 397, 66 L.Ed. 738 (1922) (acceptable federal regulation of cattle slaughtered in Chicago before reshipment of meat products to the East); Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 526, 31 S.Ct. 279, 55 L.Ed. 310 (1911) (food stuffs of local manufacturers subject to federal regulation because of sale for export); Swift & Co. v. United States, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905). But in citing such authority, appellants misconceive the issue of the present case
 The issue here is not whether Congress has the power to regulate a particular flow of commerce, but whether it has Exercised that power in a particular case. The fact that an interruption to the flow of goods in inter-state commerce does not oust federal regulatory power does not suggest that Congress intended that all regulatory statutes it enacts in the commercial area be applied to every imaginable perambulation of commercial goods. Though manufacture or processing of a product may be too "incidental" to interrupt the flow of commerce generally, such alteration in the nature of the goods may yet be substantial enough to exempt those goods from the intended reach of a particular statute. If Congress wishes to confine the shipping of Alaskan oil to American vessels, it may do so; if it wishes to lift the Virgin Islands exception from the coastwise laws, it may do so; and if Congress wishes to set conditions to the mode of re-entry to this country of goods manufactured abroad of American components, doubtless it may do so. But it has Not yet done these things, and it is not for this court to construe a statute passed for more limited purposes so as to assume these tasks itself.
 
 
 [55]
 Substantial economic and political interests both oppose and support this policy. The trial judge in the present case acknowledged, for example, that continued use of foreign vessels by petroleum companies involved in the Virgin Islands trade would injure the American marine industry. He noted that because of lower costs of foreign flag tankers, "a substantial amount of trade will be diverted from the American shipping industry" and "American ship owners and operators, shipbuilders, and seamen will lose significant business and suffer economic harm." American Maritime Association et al. v. Blumenthal et al., supra, at 855. The petroleum industry, on the other hand, has an interest in controlling costs and in making full use of existing refinery facilities, See Brief of Appellee Hess Corp. at 4-5 (describing costly investments in refineries on St. Croix), and presumably the Virgin Islands and business and other interests associated with the Islands have an interest in continuing to enjoy the stimulative effect on Virgin Islands commerce of the coastwise laws exemption. The economic and other interests at stake may have been quite different in 1936 when the Merchant Marine Act was amended to provide for that exemption. See Hearings on S. 754 before the House Committee on Merchant Marine and Fisheries, 74th Cong., 2d Sess. 8 (26 March 1936) (testimony of E. Gruening for Dep't of Interior) (purpose of exemption to enhance "bunkering" trade on St. Thomas Island); Id. at 21 (testimony of Governor of Virgin Islands) (no purpose to affect "underlying economy" of St. Croix). Yet the relevant consideration today is that economic development has occurred and substantial investments made in reliance on this exemption, which both Congress and the President have seen fit to keep in force. See note 56 Infra (statutory role of President)
 
 
 [56]
 The President plays a decisive role in the continuing exemption of the Virgin Islands from the coastwise laws because the Merchant Marine Act of 1920 provides for such exemption "until the President of the United States shall, by proclamation, declare that such coastwise laws shall extend to the Virgin Islands and fix a date for the going into effect of same." 46 U.S.C. § 877. The President to date has issued no such proclamation. This delegation of authority by Congress to the President, however, provides a second focus for attempts to lift that exemption through political channels
 
 
 [57]
 See letter of 15 September 1971, Reprinted in Jt.App. at 926
 
 
 [58]
 See Hearings on S. 2422, "An Act to Amend the Merchant Marine Act of 1920," 94th Cong., 1st Sess. (1976)
 
 
 [59]
 See H.R.12886, 92nd Cong., 2nd Sess. (1972); H.R.13530, 93rd Cong., 2d Sess. (1974); S. 2422, 94th Cong., 1st Sess. (1975); H.R.13251, H.R.14463 and H.R.14751, 94th Cong., 2nd Sess. (1976); H.R.1039, H.R.3046, H.R.8761 and H.R.9883, 95th Cong., 1st Sess. (1977)
 
 
 [60]
 See Brief of Appellee Hess Corp. at 4-5 (describing output of St. Croix refinery)
 
 
 [61]
 The only special factors that can be cited with regard to the Alaskan crude oil trade are export restrictions on Alaskan oil, See note 9 Supra, and environmental laws specially enacted to guard against environmental injury from the Alaskan oil trade, See pages --- - --- of 192 U.S.App.D.C., pages 1169-1171 of 590 F.2d & notes 63-76 Infra. But export restrictions are not unique to Alaskan oil and do not, in any event, apply to the Virgin Islands, which has the peculiar status of a "possession" of the United States exempt from U.S. "coastwise laws." Though these export restrictions do have the effect of ensuring that oil shipped by Hess does not enter the stream of foreign commerce, this fact is relevant only to the question of the shipper's intent concerning eventual destination of carried goods a consideration which we have stated elsewhere is irrelevant to the present case. See pages --- - --- of 192 U.S.App.D.C., page 1164 of 590 F.2d & notes 39-42 Supra. We also find that the environmental laws cited by appellant Seafarers Union have no bearing on the present case, See pages --- - --- of 192 U.S.App.D.C., pages 1169-1171 of 590 F.2d & notes 63-76 Infra, and that those laws certainly do not distinguish Alaskan oil from other goods carried to and from the Virgin Islands
 
 
 [62]
 The total amount of foreign commerce at stake is enormous. In 1976, for example, imports to the United States of articles manufactured from previously-exported raw materials were valued at $455,438,012, and imports of articles merely assembled abroad from U.S.-made components were valued at $5,248,588,846. See Brief of Appellee Hess Corp. at 18 n. 11, Citing Foreign Trade Imports, Bureau of Census Report IA 245-A, at 30, 148 (1977). Thus the total value in 1976 of United States foreign commerce involved in round-trip processing or manufacture, similar to that of the crude oil here, was nearly $6 billion. See also Reply Brief for Appellant American Maritime Association app. at 1a-3a (statistical appendix of selected U.S. exports returned by vessel as imports to the United States after processing, manufacture, or assembling abroad)
 
 
 [63]
 See note 30 Supra ("TAPS" Act term invented by Appellant Seafarers Union to describe P.L. 93-153, Title II, the Trans-Alaska Pipeline Authorization Act)
 
 
 [64]
 See Reply Brief for Appellant Seafarers Union at 2
 
 
 [65]
 § 401 of Pub.L.No.93-153, Title IV, 87 Stat. 589 (16 Nov. 1973), amending language of 46 U.S.C. § 391a(7)(C)
 
 
 [66]
 Pub.L.No.92-340, 86 Stat. 424 (10 July 1972), 33 U.S.C. §§ 1221-27; 46 U.S.C. § 391a (Supp. V 1975)
 
 
 [67]
 46 U.S.C. § 391a(7)(C)
 
 
 [68]
 See Reply Brief for Appellant Seafarers Union at 2-3
 
 
 [69]
 See id. at 13-14
 
 
 [70]
 46 U.S.C. § 391a(2) (emphasis added)
 
 
 [71]
 Further, no evidence has been adduced that the Hercules was in violation of any of those provisions. See Brief for Appellee Hess Corp. at 39
 
 
 [72]
 See, e. g., 119 Cong.Rec. 27641 (1973) (statement of Rep. G. Ford in House debate) (trans-Alaska pipeline oil to be shipped "from the Alaskan port of Valdez to the west coast"); Id. at 27648 (statement of Rep. Moorhead) (tankers to transport "oil treasure from Valdez to our west coast ports"); Id. at 22228 (statement of Sen. Gravel) (tankers to journey "from Valdez to Washington or California"). See also Environmental Setting Between Port Valdez, Alaska, and West Coast Ports, III Final Environmental Impact Statement, Proposed Trans-Alaska Pipeline, U.S. Department of the Interior (1972)
 
 
 [73]
 46 U.S.C. § 877
 
 
 [74]
 See note 43 Supra (for limited purposes, Virgin Islands analogous to a "foreign port")
 
 
 [75]
 46 U.S.C. § 391a(7)(C)
 
 
 [76]
 See page --- of 192 U.S.App.D.C., page 1167 of 590 F.2d & note 59 Supra