Roy P. WOOD, Jr., Thomas J. Keating, T.G. Britton, Dennis M. Wheeler, C.A. Massey, William R. Lascelle, James F. Haley, Jr., Cornelius J. Keating, Peter G. Haley, William J. Ferry, Jr., E.G. Haggerty, A.W. McGovern, D.R. Sherwood, J.W. Akerman, G.A. Canvin, Jr., R.J. Schoenlank, F.E. Reil and E.F. Sweeney, Plaintiffs,

v.

AMERADA HESS CORPORATION, ITB PHILADELPHIA, her engines, boilers, tackle, etc., in rem, ITB GROTON, her engines, boilers, tackle, etc., in rem, ITB MOBILE, her engines, boilers, tackle, etc., in rem, ITB NEW YORK, her engines, boilers, tackle, etc., in rem, ITB JACKSONVILLE, her engines, boilers, tackle, etc., in rem, Defendants,

and

Interport Pilots Agency, Inc., Intervenor/Defendant.

No. 92 Civ. 5385 (LBS).

United States District Court, S.D. New York.

Feb. 8, 1994.

Beck & Halberg, New York City (Herbert B. Halberg, Thomas L. Johns, of counsel), for plaintiffs.

Hill, Betts & Nash, New York City (John F. Keating, Eli Ellis, of counsel), for defendants.

Evans, Osborne & Kreizman, Red Bank, NJ (Joel N. Kreizman, of counsel), for intervenor-defendant.

## OPINION

SAND, District Judge.

This case involves a battle between state and federally licensed maritime pilots over the right to charge lucrative pilotage fees to U.S. commercial vessels when they enter domestic ports from the U.S. Virgin Islands (the "Islands"). The dispute concerns the anomalous status of the Islands within the centuries-old statutory scheme which divides authority over domestic and foreign shipping between the states and the federal government.

Plaintiffs, eighteen state-licensed pilots, brought this action against defendant Amerada Hess Corporation ("Hess") to recover compulsory pilotage fees allegedly owed by five Hess vessels for voyages between the U.S. Virgin Islands and the Port of New York.[1] Plaintiffs claim this right under longstanding New York and New Jersey statutes that require certain vessels to take state pilots when they enter the Port of New York. These statutes require each ship entering U.S. harbors from a foreign port to take on the first state-licensed pilot that hails them and to employ that pilot's services in guiding the ship safely through the harbor. Hess responds that its vessels were sailing under federal, not state, jurisdiction, and as such were exempt from the state pilotage statutes; in its defense, it cites a letter ruling by the United States Coast Guard. Both parties

---

1. These vessels are named as defendants *in rem* along with Hess, but none of the vessels has been served with process.

have moved for summary judgment. For the reasons set forth below, we grant Hess's summary judgment motion and deny plaintiffs' motion.

Before we turn to the facts underlying this dispute, we briefly review the relevant statutory framework, as an understanding of that framework is essential to the discussion which follows.

## I. *Statutory Background*

The maritime laws which this case requires us to construe include some of the oldest, most byzantine, and often obsolete sections of the United States Code.[2] In particular, this case requires us to address one of the country's most longstanding monopolistic regulatory systems—the institution of state compulsory pilotage.

This venerable institution, which dates back to the Roman Law,[3] has been described as follows:

> As a profession, pilotage owes its existence to the infinite variety of navigation hazards—currents, tides, sand bars, submerged objects, weather conditions, and the like—that mark the harbors and rivers open to commercial vessels. No matter how competent the master of a ship is at open sea, he cannot be expected to be familiar with the local navigation hazards of each harbor and river that he encounters as he conducts his ship in the course of a maritime trade. Accordingly, it has long been the practice of vessels to employ, for each port they enter and leave, a local pilot intimately familiar with the waters of that port to board and guide them through those waters in from or back to the open sea.

> . . . .

> Indeed, local pilotage has been regarded so important to the conduct of maritime affairs that for centuries commercial states with substantial shipping trades have required vessels entering or departing their ports to take on board a local pilot or to pay some sort of penalty. In this country, compulsory pilotage laws date back to the time of the Revolution and today, at least 23 states have such laws as part of a comprehensive pilotage regulatory system.

*Jackson v. Marine Exploration Co.*, 583 F.2d 1336, 1338–39 (5th Cir.1978) (citations omitted).

The First Congress of the United States addressed the issue of pilotage when it enacted legislation in 1789 leaving general authority over pilotage with the states.[4] This legislation, now codified at 46 U.S.C. § 8501(a) in substantially similar form, now provides:

> Except as otherwise provided in this subtitle [Chapter 85 of Title 46], pilots in the bays, rivers, harbors, and ports of the United States shall be regulated only in conformity with the laws of the States.

46 U.S.C.A. § 8501(a) (West 1993 Special Pamphlet). Congress has "otherwise provided" only to a limited extent, encompassed today by the three short sections which com-

---

**2.** *See generally* H.R.Rep. No. 98–338, 98th Cong., 1st Sess. (1983), *reprinted in* 1983 U.S.C.C.A.N. 924. As this House committee, engaged in a revision of these laws, reported, "[t]he maritime laws of the United States ... are a confusing collection of individual statutes enacted over a period of nearly two centuries ... each enacted to solve some particular problem of the day. Viewed now, as a whole, they are poorly organized, duplicative, often obsolete, and difficult to understand and apply." *Id.* at 113, 1983 U.S.C.C.A.N. 924. A few examples noted in the House Report (and since repealed) serve to illustrate the antiquated nature of these laws:

> Section 4612 of the Revised Statutes of the United States ... currently contains a chart delineating the types and quantities of food that must be made available to seamen. For example, ½ pound of biscuits, 1¼ pounds of salt beef, ½ pound of flour, ¾ ounce of coffee, ⅛

ounce of tea, ½ pint of molasses, and an ounce of lard must be provided to each seaman on Tuesdays.... Another example is section 4510 of the Revised Statutes (46 U.S.C. § 563). This section requires that the Coast Guard approve indentures by which apprentices are bound at sea.

*Id.* at 113–14, 1983 U.S.C.C.A.N. 925.

**3.** *See Ex parte McNiel*, 80 U.S. (13 Wall.) 236, 239, 20 L.Ed. 624 (1872).

**4.** Act of Aug. 7, 1789, ch. 9, § 4, 1 Stat. 53, 54. The issue of the states' power to engage in regulation of pilotage under this Act was resolved in *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1851), which remains the classic case on the interrelationship of state and federal regulatory power under the Commerce Clause.

prise Chapter 85, §§ 8501 to 8503 (the "pilotage statutes").

■ To understand the lines along which Congress has exercised jurisdiction over pilots, it is necessary to understand the basic scheme by which vessels are classified and licensed:

The basic form for the comprehensive federal regulation of trading and fishing vessels was established in the earliest days of the Nation and has changed little since. *Ships engaged in trade with foreign lands are "registered"....* "The purpose of a register is to declare the nationality of a vessel ... and to enable her to assert that nationality wherever found." *Vessels engaged in domestic or coastwise trade or used for fishing are "enrolled"....* "The purpose of an enrollment is to evidence the national character of a vessel ... and to enable such vessel to procure a ... license."

*Douglas v. Seacoast Products, Inc.*, 431 U.S. 265, 272–73, 97 S.Ct. 1740, 1745–46, 52 L.Ed.2d 304 (1977) (citations omitted & emphasis added).

This vessel documentation regime is codified in the Vessel Documentation Act of 1980.[5] Under this regime, the Coast Guard issues certificates of documentation to each vessel, which may be "endorsed" for one or more category of use. These endorsements, or licenses, are available in five categories—registry (for foreign trade), coastwise (for domestic trade), Great Lakes, fishery, and recreational—each type enabling its vessel to engage in a particular use. *See* 46 U.S.C. §§ 12105–09. On pain of forfeiture, a vessel may not engage in a trade without an endorsement covering that trade. 46 U.S.C. § 12110.

The action that Congress took in the pilotage statutes was to claim pilotage jurisdiction over those ships *not sailing under register:*

... [A] *coastwise seagoing vessel* shall be under the direction and control of a pilot licensed under [federal law] if the vessel is—

(1) *not sailing on register;*

(2) underway; [and]

(3) not on the high seas ...

46 U.S.C. § 8502(a) (emphasis added). It should be noted that the term "coastwise" (the meaning of which, as will be made clear, is at the heart of this dispute) is nowhere generally defined in the statutes governing shipping.[6]

■ In the limited realm in which Congress has claimed federal jurisdiction over pilots, the states are preempted from taking action. Section § 8501(d) provides in part:

A State may not adopt a regulation or provision that requires a coastwide [sic] vessel to take a pilot licensed or authorized by the laws of a State ...

*Id.* § 8501(d). Thus, "these two statutes read together give the Federal Government exclusive authority to regulate pilots on enrolled vessels and ... preclude a State from imposing its own pilotage requirements upon them." *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 159, 98 S.Ct. 988, 995, 55 L.Ed.2d 179 (1978). On the other hand, "just as it is clear that States may not regulate the pilots of enrolled vessels, it is equally clear that they are free to impose pilotage requirements on registered vessels entering and

---

**5.** Pub.L. No. 96–594, title I, 94 Stat. 3453 (codified as amended at 46 U.S.C.A. §§ 12101–23 (West Special Pamphlet 1993)).

**6.** Neither "coastwise," "coastwise vessel," nor "coastwise trade" are defined in the general definitional section of Title 46, Subtitle II, which governs vessels and shipping. *See* 46 U.S.C. § 2101 (definitional section for Subtitle II).

Note, however, that "coastwise voyages" are defined for the limited purpose of merchant seamen protection and relief. *See* 46 U.S.C.A. §§ 10301, 10501 (West Special Pamphlet 1993). Section 10501 provides that, with the exception of certain vessels covered by § 10301 (in particular, vessels of at least 75 gross tons traveling from a U.S. Atlantic port to a Pacific port), the term "coastwise voyages" applies to "a [U.S.] vessel of at least 50 gross tons on a voyage between a port in one State and a port in another State (except an adjoining State)." "State," for the purposes of Subtitle II of Title 46 (of which the above is a part), is defined as "a State of the United States, ... the Virgin Islands, ... and any other territory or possession of the United States." 46 U.S.C.A. § 2101(36) (West Special Pamphlet 1993).

leaving their ports." *Id.* at 159–60, 98 S.Ct. at 995.[7]

.This is exactly what New York and New Jersey have done in the statutes which give rise to this action. New York's compulsory pilotage statute provides in pertinent part:

> *Every foreign vessel and every American vessel under register* entering or departing from the Port of New York by the way of Sandy Hook ... shall take a Sandy Hook pilot licensed under the authority of this article or under the laws of the state of New Jersey ... Whenever the services of such a pilot are refused, the master, owners or consignees, shall pay pilotage as if one had been employed. Such pilotage shall be paid to the pilot first speaking or offering his services as pilot to such vessel.

N.Y.Navig.Law § 88(1) (McKinney 1989) (emphasis added).

The New Jersey statute provides, similarly, that "[a]ll masters of foreign vessels *and vessels from a foreign port,* and all vessels sailing under register ... shall take a licensed pilot." N.J.Stat.Ann. § 12:8–35 (emphasis added).

## II. *Factual Background*

Plaintiffs are members of organizations known as the United New York Sandy Hook Pilots Benevolent Association and the United New Jersey Sandy Hook Pilots Benevolent Association (the "Sandy Hook pilots"). Through an agent, the Sandy Hook pilots for some years have assigned their member pilots on a rotational basis to pilot vessels into and out of New York Harbor. Prior to June 1992, they provided pilotage services for Hess vessels entering New York Harbor.[8]

Defendant Hess is a corporation engaged in the petroleum business. It operates an oil refinery in St. Croix, the U.S. Virgin Islands, and during the period covered by this action it used the five U.S. flag vessels named in this action (the "Hess vessels") to transport oil products from its refinery in St. Croix to New York. Pursuant to the Vessel Documentation Act of 1980, 46 U.S.C. § 12103(a), 46 C.F.R. § 67.17–1(c) (1992), Hess endowed those ships with certificates of documentation endorsed for both coastwise and registry use. When the vessels sailed between St. Croix and New York during the relevant period, the crews entered notations in the ships' logs indicating that the vessels were sailing on their coastwise endorsements.

Defendant/Intervenor Interport Pilots Agency, Inc. ("Interport") is a foreign corporation whose members are pilots holding federal licenses issued by the U.S. Coast Guard but who are not licensed by the States of New York or New Jersey. In February 1992, Interport's president, Capt. Lou Bettinelli, wrote to the Coast Guard, urging that it assert jurisdiction over pilotage on U.S. vessels sailing with coastwise licenses between New York and the Virgin Islands. Bettinelli asserted that Interport pilots had provided pilotage in the past for Hess ships traveling between St. Croix and New York, but that the New York Board of Commissioners of Pilots had recently begun to assert its authority over all U.S. vessels in the New York–to–St. Croix trade, and to require Hess's vessels to take on state-licensed pilots instead of federal.

By letter dated June 2, 1992 (the "Letter Ruling"),[9] the Coast Guard responded that

---

7. Viewed from traditional perspectives of federal-state relations, this statutory scheme presents an anomaly. Ships engaged in foreign commerce, which would seem to be a classic federal concern, are subject to state pilotage statutes; ships engaged in domestic coastwise commerce are subject to federal pilotage statutes. This anomaly is enhanced by virtue of the fact that foreign vessels, by virtue of 46 App. U.S.C. § 883, cannot operate coastwise. 46 App. U.S.C. § 883 (West Supp.1993).

8. The parties contest whether these services were exclusive. *See* plaintiffs' Statement Pursuant to

Local Rule 3(g) ¶ 9; Defendant's Rule 3(g) Counter–Statement ¶ 9.

9. The letter, written by Capt. F.J. Grady, Chief of the Merchant Vessel Personnel Division, and signed "By direction of the Commandant," is reproduced as an Appendix to this Opinion. The Letter Ruling was subsequently clarified and reaffirmed· in two additional Coast Guard letters. ·The first of these was issued following a meeting with state pilots aggrieved by the Letter Ruling. *See* Gehegan Aff. Exh. I (letter of Capt. J.F. McGowan, U.S.C.G., to Capt. Pat J. Neely, Jr., dated Oct. 13, 1992). The second letter responded to this Court's inquiry as to the Coast Guard's

vessels, such as Hess's, which have been endorsed for both coastwise and registry use may elect under which of their endorsements they wish to sail when they carry domestic products to or from the Virgin Islands. If a vessel sails under its coastwise endorsement, the Coast Guard concluded, it is subject to federal pilotage authority and would be required to use a federal pilot; conversely, if it sails under registry, it is subject to state authority and would be required to use a state pilot.

Hess responded to the Letter Ruling by directing its vessels traveling between St. Croix and New York to sail under their coastwise endorsements and, relying on those endorsements, to turn down plaintiffs' offers of pilotage services and to engage the services instead of Interport's federally licensed pilots. Plaintiffs responded by submitting invoices to Hess for the refused pilotage services and warning them that refusal to pay the invoices would lead to further action. Hess responded that, in reliance on the Coast Guard ruling, it had availed itself of the services of Interport pilots and would not be paying plaintiffs' invoices.

Plaintiffs then commenced this action. They seek $54,658.02, plus interest and costs, comprising statutory compensation for eighteen occasions on which Hess vessels sailing from St. Croix into the Port of New York refused their services. Of course, what is at stake is the vastly larger amount comprising not only plaintiffs' future services for Hess but also the future services that all state pilots may provide to any U.S. vessels transporting domestic products between the U.S. Virgin Islands and any domestic port.

After the Sandy Hook pilots brought this action, Interport moved to intervene as a defendant, pursuant to Federal Rule of Civil Procedure 24(a), on the ground that its interest in continuing to do business with Hess's ships, and with other ships traveling between the Virgin Islands and U.S. ports, was jeop-

ardized by plaintiffs' action and not adequately protected by the existing defendant. Interport's motion was granted without objection.

By letter dated April 13, 1993, the Court informed the Coast Guard of the litigation and inquired whether it wished to intervene in this action or otherwise make its views known. The Coast Guard responded with a four-and-a-half-page, single-spaced letter which expanded on the reasoning behind the Coast Guard's Letter Ruling and also concluded that "[b]ecause the Coast Guard does not have a direct interest in the outcome of these proceedings, we do not seek to intervene." Letter of Capt. J.P. Wiese, dated June 1, 1993 (the "Wiese letter").[10]

### III. *Discussion*

No material facts are in dispute, and this matter may be properly disposed of by summary judgment.

As noted above, the New York pilotage statute provides that "[e]very foreign vessel and *every American vessel under register* entering or departing from the Port of New York ... shall take a Sandy Hook pilot." N.Y.Navig.Law § 88(1) (emphasis added). The New Jersey pilotage statute employs essentially the same language but applies to "vessels from a foreign port" as well. N.J.Stat.Ann. § 12:8–35.

Plaintiffs do not contend that Hess's vessels are "foreign vessels," or "vessels from a foreign port," or that they sailed "under register." Both parties agree that the Vessels are U.S. flag vessels endorsed for both coastwise and registry use, and that they sailed under their coastwise endorsements for the voyages in question.[11] *See* Pls.' Rule 3(g) Statement ¶¶ 3, 10; Defs.' Rule 3(g) Counter–Statement ¶¶ 3, 23. Hess contends that this disposes of the matter—that the New York statute, on its face, is simply inapplicable to the Hess vessels on the voyages in

---

position in this action. *See infra* note 10 and accompanying text.

**10.** The letter is signed "[b]y direction," presumably of the Commandant. It identifies Capt. Wiese as Chief of the Coast Guard's Claims and Litigation Division.

**11.** Plaintiffs do not argue that ports in the U.S. Virgin Islands are foreign ports. As a U.S. territory, the Islands are of course not "foreign." *See infra* note 6.

question. While we think this may well be the case, we will proceed nevertheless to examine plaintiffs' arguments on the merits.

Plaintiffs labor heroically to show that the Vessels somehow fall under the New York statute's scope and hence that Hess owes state pilotage fees. They advance essentially two arguments. First, they argue that the "critical issue" is not whether Hess's vessels sailed "under register" but instead "whether the [voyages] constituted coastwise trade"; if the voyages did not "constitute coastwise trade," they argue, they fall outside the scope of federal jurisdiction and thus within the reach of the state statutes. Pls.' Reply Mem. at 3. Alternatively, they argue, Hess's vessels "must be deemed to have operated under their registry endorsement" because the applicable laws and regulations do not allow them to sail under any other endorsement. Pls.' Reply Mem. at 6. We will consider these two arguments in turn.

### A. *The Scope of Federal Jurisdiction*

■ Plaintiffs' central argument is that the Hess vessels were not "engaged in coastwise trade" and thus fall outside the scope of federal jurisdiction and within the reach of the New York and New Jersey statutes. Plaintiffs argue essentially as follows:

1) The federal pilotage statutes (46 U.S.C. §§ 8501–03) confer plenary authority on the states to regulate pilots, with the sole material exception for "coastwise seagoing vessel[s] ... not sailing under register" (§ 8502(a)).

2) The Hess vessels were not "coastwise seagoing vessels" and consequently fell within state pilotage jurisdiction.

3) New York and New Jersey "have exercised the full extent of the permissible pilotage jurisdiction granted to the states by Congress pursuant to 46 U.S.C. § 8501." (Pls.' Mem. at 10.)

4) Consequently, the Hess vessels fell within the reach of the New York and New Jersey statutes.

We find this argument meritless. Even if one were to assume *arguendo* plaintiffs' premise that the Hess vessels were "not engaged in coastwise trade," the proposition that "New York and New Jersey have exercised the full extent of [their] permissible pilotage jurisdiction" remains entirely unsupported. The fact that New York and New Jersey may have had the authority to pass statutes requiring compulsory pilotage fees from "all vessels not engaged in coastwise trade" does not mean that they have in fact done so. It goes without saying that we must refer to the language of the statutes as written, not as they might have been written; and the language of the New York and New Jersey statutes on their face reaches only "foreign vessels" and "vessels under register."

We turn, therefore, to another contention advanced by plaintiffs (Pls.' Reply Mem., at 6–7)—that since the Hess vessels could not legally have sailed on their coastwise endorsements, they must be "deemed to have operated under their registry endorsement." This argument, although stronger, is also not without its difficulties, as described below.

For the proposition that Hess's vessels were "not engaged in coastwise trade" when they transported oil from the Virgin Islands to the Port of New York, plaintiffs rely primarily on § 27 of the Merchant Marine Act of 1920 (the "Jones Act") and the leading case construing the applicability of that act to the Virgin Islands, *American Maritime Assoc. v. Blumenthal,* 590 F.2d 1156 (D.C.Cir. 1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979).[12]

The Jones Act provides:

No merchandise shall be transported by water ... between points in the United States, including ... possessions thereof

---

12. The term "Jones Act" is most commonly used to refer to § 33 of the Merchant Marine Act of 1920, 41 Stat. 1007 (codified as amended at 46 App. U.S.C.A. § 688 (West Supp.1993)), providing for recovery for injury to, or death of, a seaman. However, the *Blumenthal* court and the parties in this action use the term to refer to another section of the Merchant Marine Act,

§ 27, 41 Stat. 999 (codified as amended at 46 App. U.S.C.A. § 883 (West Supp.1993)), which serves to protect the American shipping industry from foreign competition by *requiring all vessels engaged in the coastwise or other domestic trade to be American-built and owned. See generally Blumenthal,* 590 F.2d at 1158–59. We will follow the parties' usage and do likewise.

embraced within the coastwise laws ... in any other vessel than a vessel built in and documented under the laws of the United States and owned by persons who are citizens of the United States.

46 App. U.S.C.A. § 883.

The Act, however, specifically exempts the U.S. Virgin Islands from its reach:

*[T]he coastwise laws of the United States shall not extend to the Virgin Islands of* the United States until the President of the United States shall, by proclamation, declare that such coastwise laws shall extend to the Virgin Islands ...

46 App. U.S.C.A. § 877 (emphasis added).

Noting that the U.S. Virgin Islands had been "expressly excluded from U.S. coastwise laws," 590 F.2d at 1161, the D.C. Circuit concluded that "the Virgin Islands are, *for the limited purposes of the Jones Act,* analogous to a 'foreign port,'" *id.* at 1164 n. 43 (emphasis in original).[13]

Plaintiffs conclude that "the legal reasoning applied in the *Blumenthal* decision ... is applicable in this case and leads to the conclusion that the Hess vessels were not engaged in coastwise trade and consequently that state pilotage was required." Pls.' Mem. at 14.

Hess disputes the relevance of *Blumenthal* and of the Jones Act. It argues that the Jones Act is a statutory scheme entirely independent from the pilotage statute (46 U.S.C. §§ 8501–03), and that consequently

the meaning of the term "coastwise" in the one statute is independent of the meaning of the term in the other.[14] While the pilotage statute lays out the extent of state and federal jurisdiction over pilots, Hess argues, the Jones Act, enacted a half century later than the pilotage statute's precursor, reflects an entirely different purpose: it is a protectionist law which forbids all ships other than U.S.-built and -owned vessels from engaging in the coastwise trade. The fact that Congress chose to exclude the Virgin Islands from the Jones Act's restrictions (by providing that "the coastwise laws of the United States shall not extend to the Virgin Islands"), Hess argues, should have no bearing on whether ships traveling to and from the Islands are "coastwise seagoing vessel[s]" within the meaning of § 8502 of the pilotage statute, and thus subject to federal pilotage jurisdiction.

In support of this proposition, Hess cites a wealth of authority showing that the courts have defined the reach of federal pilotage jurisdiction not in relation to the coastwise trade laws but in relation to *the domestic or foreign nature of the commerce involved* —they have described federal pilotage jurisdiction as extending to all vessels engaged in domestic commerce, while leaving to the states the regulation of pilots on vessels engaged in foreign commerce.[15] Since the Virgin Islands are a U.S. territory, commerce with the Islands is clearly "domestic" rather than "foreign" commerce.[16] Accord-

---

13. The court noted, however, that "[d]isagreement concerning the precise term of identification to be applied to the Virgin Islands in this context is merely academic, however, for the words of the statute suffice to resolve the issue at hand." 590 F.2d at 1164 n. 43.

14. Interport makes the same argument in its letter brief. *See* letter to the Court of Joel N. Kreizman dated February 8, 1993, at 1–2.

15. For example, the Supreme Court in 1901 described the intent of the federal pilotage statute as being the extension of federal pilotage jurisdiction over vessels "engaged in the coastwise or interior commerce of the country," while at the same "leav[ing] to the states the regulation of pilots upon all vessels engaged in foreign commerce." *Huus v. New York & Porto Rico Steamship Co.,* 182 U.S. 392, 394, 21 S.Ct. 827, 828, 45 L.Ed. 1146 (1901) (holding that a U.S. flag vessel engaged in trade between Puerto Rico and New

York was not subject to New York pilotage laws). U.S. courts have followed the *Huus* Court's lead, equating "coastwise" licensing with domestic trade and "registry" with foreign trade. *See Douglas v. Seacoast Prods., Inc.,* 431 U.S. 265, 272–73, 97 S.Ct. 1740, 1745–46, 52 L.Ed.2d 304 (1977); *Anderson v. Pacific Coast Steamship Co.,* 225 U.S. 187, 199–205, 32 S.Ct. 626, 630–33, 56 L.Ed. 1047 (1912); *Interport Pilots Agency, Inc. v. Sammis,* 14 F.3d 133, 136 (2d Cir.1994) (describing "coastwise vessels" as "American flag vessels sailing between American ports" and "registered vessels" as foreign flag vessels and American vessels "engaged in foreign trade"); *Jackson v. Marine Exploration Co.,* 583 F.2d 1336, 1340–41 (5th Cir.1978).

16. Plaintiffs do not argue otherwise, and indeed they cannot. Under Subtitle II of Title 46 of the United States Code, territories, including expressly the Virgin Islands, are treated for all

ingly, Hess concludes, pilots engaged in commerce with the Islands are engaged in domestic commerce and so must fall under federal pilotage jurisdiction.[17]

The shortcoming of Hess's argument, of course, is that these courts' loose definitions of the meaning of "coastwise," while reliable in most contexts, were not offered in the context of examining the anomalous status of the Virgin Islands within this statutory scheme.

■ As the Coast Guard notes in its June 1993 letter by Capt. Wiese, the Virgin Islands inhabit a peculiar niche in the shipping laws—they are a territory of the United States, and yet they are excluded from the coastwise trade laws. The result is a "legal anomaly which does not arise anywhere else in the law of pilotage." Wiese letter at 3. The Virgin Islands are excluded from the coastwise trade laws, and yet commerce with the Islands is domestic rather than foreign commerce, and commercial voyages between an Atlantic Coast port and the Virgin Islands are considered "coastwise voyages." [18]

In this anomalous situation, the Coast Guard concluded,

> there is nothing to preclude a U.S. vessel which has legally been issued a U.S. certificate of documentation endorsed for both coastwise and registry trade from engaging in trade with the U.S. Virgin Islands and using either endorsement under the proper circumstances.

purposes as states. 46 U.S.C. § 2101(36) (1993). Additionally, federal shipping regulations define "United States" as "the States of the United States, ... *the Virgin Islands*, ... and any other territory or possession of the United States." 46 C.F.R. § 67.01–1 (emphasis added). *See also The Winnie*, 65 F.2d 706, 707 (3d Cir.1933) ("a foreign port within the meaning of [former 46 U.S.C. § 278, relating to coastwise vessels on a foreign voyage] is a port or place exclusively within the sovereignty of a foreign nation").

17. Hess makes these points as part of a separate argument—that the New York and New Jersey statutes are preempted by federal law. This is not, however, an argument that we need to address. Since we conclude below that the New York and New Jersey statutes did not reach the Hess vessels, we do not have to answer the question whether they were preempted by federal law from doing so.

Wiese letter at 4. The Coast Guard explains this conclusion as follows:

> This interpretation, which has been adhered to consistently by the Coast Guard, is reasonable because the coastwise trade laws [i.e., the Jones Act] grant an exclusive privilege to certain U.S. flag vessels to engage in the coasting trade. These laws are restrictive, prohibiting all other vessels from engaging in this trade. By exempting the U.S. Virgin Islands from the coastwise trade laws, Congress has not further restricted trade, but rather has opened the door wide to trade by U.S. vessels who enjoy the coastwise trade law protections, U.S. flag vessels trading only on registry endorsement and all foreign vessels.

*Id.*

The implication of the Coast Guard's argument appears to be that, since the exemption of the Virgin Islands from the coastwise trade laws was meant to expand rather than restrict trade to the Islands, the exemption should not be construed as somehow transforming that trade into foreign trade; instead, it should be seen as conferring a benefit on a particular local economy within the flow of domestic interstate commerce.[19] This being the case, it would be inappropriate to seize on the Virgin Island's favored status with regard to the coastwise trade laws as a means of imposing burdens on ships engaged in that trade. We find this to be at least a plausible, facially convincing interpretation of the Virgin Islands' status within the trade and pilotage laws.[20]

18. See *supra* note 6.

19. Neither defendants nor the Coast Guard point to any evidence in support of this interpretation (whether in the legislative history or otherwise); nevertheless, evidence supporting the Coast Guard's interpretation can be found in the D.C. Circuit opinion on which plaintiffs rely so heavily. *See American Maritime Association v. Blumenthal*, 590 F.2d 1156, 1166–68 & n. 55 (1978) (examining past and present policies behind the Virgin Islands exemption).

20. We find no merit in plaintiffs' assertion that the Coast Guard's position conflicts with the legislative history of the Vessel Documentation Act of 1980.

We do not have to decide this question *de novo*, however, in light of more than one aspect of the posture of this case.

■ First, statutory interpretation by an agency responsible for the administration of that statute is entitled to substantial deference. *Chevron United States, Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Atlantic States Legal Foundation v. Eastman Kodak Co.*, 12 F.3d 353, 358 (2d Cir.1993) (deferential treatment due to federal agency entrusted with administration and enforcement of the statute in question). This is particularly true when dealing with "the niceties of pilot licensure, a subject which has been delegated to the [Coast Guard and local port authorities], not to the courts." *Campos v. Puerto Rico Sun Oil Co.*, 536 F.2d 970, 974 (1st Cir.1976). Where, as here, the Coast Guard's interpretation of its own regulations is within reasonable limits, it would be inappropriate for the courts to overrule it. *Id.*[21]

■ Second, and perhaps even more significantly, the issue of the Virgin Islands' status within the shipping laws arises not in a direct challenge to the Coast Guard's ruling under the Administrative Procedure Act but in the context of a private action to recover pilotage fees. Plaintiffs seek to recover fees from a private defendant which acted in reliance on a Coast Guard ruling approving its choice of endorsement. Plaintiffs' challenge to the validity of the Hess vessels' endorsements is thus a collateral attack on the Coast Guard letter ruling which approved those endorsements. *Cf. Campos*, 536 F.2d 970 (private action to collect pilotage fees was collateral attack on Coast Guard pilot-licensing decision). "Collateral inquiry into agency action, while not completely precluded, is severely limited to only the most basic errors affecting the essential fairness of the action."

*Campos*, 536 F.2d at 974. Plaintiffs' challenge does not approach this level.

■ We note as well that the collateral nature of this action puts Hess in a peculiarly uncomfortable situation. It would be manifestly unjust to hold Hess liable for state pilotage fees after its vessels have employed federal pilots in reliance on a Coast Guard letter ruling. As the Coast Guard noted in its Letter Ruling, a vessel sailing under a coastwise endorsement is under federal pilotage authority and is required to employ a federal pilot. Letter Ruling at 2. Accordingly, as Hess points out, a ruling in favor of plaintiffs would subject Hess to double liability for the voyages in question.[22] *Cf. Campos*, 536 F.2d at 974–75 ("It would seem unfair to hold a defendant who has relied upon a license liable for statutory pilotage fees because of an interpretation contrary to that of the issuing authorities").

**B.** *The Regulatory Argument*

■ Plaintiffs argue, secondly, that the Hess vessels "must be deemed to have operated under their registry endorsement" because the applicable regulations on licensing did not allow them to sail coastwise.

Coast Guard regulations, as described above, provide for five types of vessel licenses: registry, coastwise, Great Lakes, fishery, and pleasure. The regulation on registry endorsements provides:

> A registry endorsement is available to a vessel to be employed in foreign trade; trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; and in other employment for which a coastwise license or Great Lakes license or fishery license is not required.

46 C.F.R. § 67.17–3 (1992). The regulation on coastwise licenses provides:

> A coastwise license endorsement entitles the vessel to employment in the coastwise

---

**21.** *See also Blumenthal*, 590 F.2d at 1163 n. 38 (Customs Service "letter rulings, ... though addressed to individuals and not developed through adversarial or any form of rulemaking proceedings, are binding on the agency ... and merit some deference by a reviewing court").

**22.** A finding that the Hess vessels sailed unlawfully on their coastwise endorsements could also have other, far more serious collateral consequences. *See* 46 U.S.C. § 12110(c) ("A vessel and its equipment are liable to seizure by and forfeiture to the United States Government— ... (2) when a vessel is employed in a trade without an appropriate trade endorsement.").

trade and any other employment for which a registry, fishery, or Great Lakes license is not required.

*Id.* § 67.17–5.

The regulations provide that a vessel's Certificate of Documentation "may be simultaneously endorsed for as many licenses as the vessel is qualified for." *Id.* § 67.17–1. Plaintiffs rely heavily on a note appended to this section, which reads as follows:

> NOTE: Where a vessel possesses a certificate of documentation bearing two (2) or more endorsements, *the actual use of the vessel determines the license* under which it is operating.

*Id.* following § 67.17–1 (emphasis added). Plaintiffs argue, citing *Blumenthal,* that the "actual use" of the Hess vessels "could statutorily not be in the coastwise trade," and so consequently "the Hess vessels must be considered to have been operated under their registry endorsement." Pls.' Reply Mem. at 6.

Unfortunately, Hess does not respond to the issue of "actual use" in its briefs or in its letters to the Court. The Coast Guard, however, interprets "actual use" in a more open-ended manner, as referring essentially to any use not forbidden by law:

> In most cases, it would be clear under which endorsement a vessel was sailing, because the voyage it is involved in would dictate one endorsement or the other. A U.S. flag vessel with dual endorsements would, for instance, be considered operating on its registry endorsement where it was carrying any domestic cargo for delivery to a foreign port, carrying any foreign cargo for delivery to a U.S. port, [etc.]. If a dual documented U.S. flag vessel does not fit any of the above voyage criteria, it may sail on its coastwise endorsement. In the case of the U.S. Virgin Islands, a U.S. flag vessel carrying domestic products does not fit into one or the other category, but rather fits into either category. That is, neither endorsement is absolutely required. All that is required is that the vessel sail under one or the other.

Wiese letter at 4.

As with plaintiffs' statutory argument, we find the Coast Guard's interpretation of its regulatory mandate eminently reasonable, and we remain unconvinced by plaintiffs' arguments that Coast Guard regulations required the Hess vessels to sail under their registry rather than their coastwise endorsements.

### C. *An Additional Hurdle*

Thus, we find entirely reasonable the Coast Guard's interpretation of both the scope of its jurisdiction and of its regulations. Even were we to find plaintiffs' construction of the governing regulations more convincing than we do, however, plaintiffs would find a formidable additional hurdle imposed by the posture in which they have brought this action.

Plaintiffs, of course, have brought this action under the New York and New Jersey pilotage fee statutes instead of challenging the Coast Guard's ruling directly. As noted above, the New York and New Jersey statutes on their face reach only "foreign vessels" and "vessels under register," so plaintiffs are forced to argue that the Hess vessels must "be deemed to have sailed on their registry endorsements." Such an argument stretches the statutes beyond their appropriate reach.

In construing the reach of the New York and New Jersey pilotage statutes, we bear in mind the fundamental rule of statutory construction that when the language of a statute is unambiguous, a court should give effect to its "plain meaning." *Samuels, Kramer & Co. v. Commissioner of Internal Revenue,* 930 F.2d 975, 979 (2d Cir. 1991); *In re Chateaugay Corp.,* 920 F.2d 183, 184 (2d Cir.1990). These two statutes, requiring pilotage fees of "foreign vessels" and "vessels under register," simply cannot be made to stretch to encompass U.S. flag vessels sailing under coastwise endorsements. Even were we to conclude that, as plaintiffs contend, the Coast Guard's interpretation of its regulations is erroneous and the Hess vessels sailed under invalid coastwise endorsements, it is nevertheless beyond the power of this Court to order Hess to pay fees pursuant to a statute which by its terms does not apply.

## CONCLUSION

For the reasons set forth above, we deny plaintiffs' motion for summary judgment and grant Hess's cross-motion, dismissing the case as a matter of law. The dismissal is without prejudice to plaintiffs' ability to challenge the Coast Guard's Letter Ruling directly in an action brought against the Coast Guard under the Administrative Procedure Act.

SO ORDERED.

142

# APPENDIX

U.S. Department
of Transportation

United States
Coast Guard

Commandant
U.S. Coast Guard

2100 Second Street, SW
Washington, DC 20593-0001
Staff Symbol: G-MVP-7
Phone: (202) 267-6249

JUN 2 1992
16637

Captain Louis Bettinelli
President, Interport Pilots Agency, Inc.
Foot of Port Monmouth Road
Port Monmouth, NJ 07758-0236

Dear Captain Bettinelli:

This is in response to your letter of February 27, 1992, regarding the Coast Guard's position on pilotage requirements for vessels engaged in trade between New York and St. Croix, U.S. Virgin Islands (USVI).

A registry endorsement on a U.S. vessel's Certificate of Documentation would allow the vessel to trade with the USVI. Title 46 CFR 67.17-3(a), states: "A registry endorsement is available to a vessel to be employed in foreign trade: trade with Guam, American Samoa, Wake, Midway, or Kingman Reef; and in other employments for which a coastwise license or Great Lakes license or fishery license is not required."(emphasis added). Therefore, there is nothing to preclude a U.S. vessel with a registry endorsement from trading with the USVI if a coastwise license is not required. A coastwise license would not be required as the coastwise laws to date have not extended by proclamation to the Virgin Islands (46 U.S.C. 877).

A coastwise endorsement on a U.S. vessel's Certificate of Documentation would also allow the vessel to trade with the USVI. Title 46 CFR 67.17-5(a), states: "A coastwise license endorsement entitles the vessel to employment in the coastwise trade and any other employment for which a registry, fishery, or Great Lakes license is not required."(emphasis added). For the same locations enumerated in 46 CFR 67.17-3(a) above, a registry endorsement would not be required for a U.S. vessel with a coastwise license endorsement.

A U.S. vessel which has legally been issued a U.S. Certificate of Documentation endorsed for both coastwise and registry may engage in trade with the USVI using either endorsement. The Documentation Act of 1980 allows for multiple trade endorsements so that a vessel may be eligible to sail under either endorsement. However, that vessel may not sail under

16637

Subj: REPLY TO CAPTAIN BETTINELLI'S LTR OF 2-27-92.

both endorsements at once; it must sail under one or the other during any given voyage. For U.S. vessels carrying domestic products to or from the USVI, neither endorsement is absolutely required, only that one or the other be used.

The master of the vessel may elect which endorsement to sail under, but the election must be consistant throughout the voyage.

If a U.S. vessel is sailing to or from the USVI (e.g., St. Croix) under its coastwise license endorsement, it is under federal pilotage authority, and would be required to use a federal pilot. Conversely, if a U.S. vessel is sailing to or from the USVI under registry, it is under state pilotage authority and would be required to use a State pilot.

Sincerely,

F. J. GRADY
Captain U.S. Coast Guard
Chief, Merchant Vessel
Personnel Division.
By direction of the Commandant

Copy: New York State Board of Commissioners of Pilots